PHILLIP ALAMPI, SECRETARY OF THE DEPARTMENT OF
AGRICULTURE, STATE OF NEW JERSEY, APPELLANT,
v. OSCAR SUSSMAN, RESPONDENT.

Argued March 5, 1979—Decided April 25, 1979.

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for appellant (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Mark Schorr,* Deputy Attorney General, on the brief).

*Mr. Joseph M. Assan* argued the cause for respondent (*Messrs. Brener, Cossman, Levenstien, O'Hara, Wallack* and *Rosner,* attorneys; *Mr. Steven L. Aiken,* on the brief).

The opinion of the court was delivered by

SCHREIBER, J. This appeal concerns the underlying legislative purpose of the New Jersey State Employees' Awards Program, *N. J. S. A.* 11:2C-1 to 9. The case has its genesis in a suggestion filed by Dr. Oscar Sussman with the New Jersey State Employees' Awards Committee, which first denied an award, but subsequently, upon reopening the proceedings and after several days of hearings, granted a $5,000 award. When Phillip Alampi, Secretary of the Department of Agriculture, sought to reopen the proceedings a second time, the Committee refused and the Secretary appealed. The Appellate Division affirmed the award in an unreported opinion and we granted the Secretary's petition for certification. 78 *N. J.* 329 (1978).

The Legislature created within the Department of Civil Service a committee known as the New Jersey State Employees' Awards Committee. *N. J. S. A.* 11:2C-2. Its function is to establish and administer plans to reward state employees for suggestions designed "to promote efficiency and economy in State Governmental functions * * *." *N. J. S. A.* 11:2C-6. Such suggestions must be implemented before an award may be given. *Civil Service Personnel Manual,* subpart

22–1.101c (March 29, 1976), superseded by subpart 22–1.103a (August 4, 1978).

On August 15, 1974 Dr. Sussman, then Director of Consumer Health Services in the Department of Health, submitted his suggestion on an officially prescribed form. He suggested that the State eliminate its meat and poultry inspection program under the New Jersey Meat and Poultry Inspection Act, *N. J. S. A.* 24:16B–1 to 71. The New Jersey statute had been adopted in 1968 to complement the Federal Meat Inspection Act, 21 *U. S. C. A.* §§ 601 to 695. Under that act the federal government agreed to bear half the costs of administering a state inspection program provided the state's standards were at least equal to those of the United States Department of Agriculture. 21 *U. S. C. A.* § 661. However, if the State failed to carry out these functions, so that the federal criteria were not met, the federal government's inspection program would then replace that of the State.

Accordingly, Dr. Sussman proposed that New Jersey abolish its inspection scheme, for then the "meat and poultry [would] be inspected exactly the same way" by the federal authorities. Dr. Sussman had been publicly urging that proposal since 1968. He had made that recommendation to Governors Hughes, Cahill and Byrne and to the Legislature, but to no avail. Governor Cahill proposed that the program be eliminated, but the Legislature refused to accede to that request.

In 1975 Governor Byrne was faced with an extremely difficult task in balancing the budget. Among other economy measures, he line vetoed the $325,000 appropriation for the state meat and poultry inspections. The Legislature acquiesced in the veto and since July 1, 1975 the program has lain dormant.

After receiving Dr. Sussman's application in August 1974, the Awards Committee circulated it to the Departments of Health, Treasury and Agriculture for their comments. The

Department of Health responded that "since the quality of meat inspection will be the same, plus a savings of more than $300,000 per year to the State Treasury," the award was in order. The Department of Agriculture replied that the proposal had previously been considered by the Legislature and that the federal and state programs were not identical. It explained that the state program, for example, included inspection of customer slaughterhouses, which the federal regulations exempted. It recommended the award be denied. The Treasury Department concurred.

On March 12, 1975 the Committee notified Sussman that the award had not been approved. The Committee, as a result of Dr. Sussman's request in December 1975, reopened the proceedings. It designated a Hearing Examiner who was directed to make findings on issues concerning originality, eligibility, implementation and causation. The Hearing Examiner concluded that Dr. Sussman was the "only person" who had suggested termination of the state program before his filing of the suggestion in August 1974 with the Committee. The Examiner also found that

[a]lthough the evidence supports some inference that the State Program was terminated in 1976 [sic; 1975] after persistent attempts by [Dr. Sussman] to effect the same result, it is clear that the Legislative action was also motivated by existing economic circumstances and anticipated substantial anticipated revenue deficits which forced government economies.

The Committee, at a meeting held on December 21, 1976, approved an award for $5,000. It concluded that Dr. Sussman was the originator of the suggestion and the State had not produced the substantial evidence needed to establish that elimination of the state inspection was not motivated at least in part by Dr. Sussman's suggestion.

Secretary of Agriculture Alampi requested the Committee to reconsider its opinion. He claimed that the matter was not a proper subject for an award, for supplanting the state inspection program with federal controls was a matter of high

level executive and legislative policy decisionmaking. The ᵗfederal legislation offered the states a *policy choice* which New Jersey had made in response to a fiscal crisis.

The Committee refused to reopen the matter. Its minutes reflect that it believed the only issue being raised was that of causation, and with respect to that it could not conclude that Dr. Sussman had not played a role in bringing about the final implementation of his suggestion. The $5,000 award was confirmed. The Appellate Division affirmed, finding that the determination was supported by substantial evidence in the record. We reverse.

The dispositive issue is whether a public policy decision which rests within the discretion of the Legislature may be the subject matter of an award under the act. Neither the Awards Committee nor the Appellate Division addressed this issue though it had been raised by the Secretary of Agriculture. The Awards Committee is directed to

establish, maintain and administer plans for awards programs for State employees designed to promote efficiency and economy *in State Governmental functions*, to reward individual employees for meritorious performances and suggestions. [*N. J. S. A.* 11:2C–6; emphasis supplied]

The phrase "in State Governmental functions" refers to activities in which the State is actually engaged. It indicates that eligible suggestions are those that will improve administrative efficiency or economy. It does not relate to the exercise by the Legislature of its policymaking authority. Decisions of this type entails the balancing of costs against the public benefit. In this decisionmaking process legislators and the Governor may be influenced by many groups with divergent interests.

This interpretation of the statute is buttressed by the antecedent of *N. J. S. A.* 11:2C–1 to 9 and the regulations adopted by the Civil Service Commission. Prior to enactment of the State Employees' Awards Act, a comparable program was operated by the Department of Civil Service pursuant to

an executive directive of Governor Driscoll. See *Department of Civil Service, N. J. State Employees Suggestion Award Program, Manual of Information and Operational Procedures* 1 (1952). The Governor's introductory message stated that the plan was designed "to encourage employee participation in our day-to-day operation of government to the end that maximum utilization of resources may be realized * * *." *Id.*

In its manual for this awards program, the Department of Civil Service stated that constructive ideas were desired on how to:

Improve all services to the public.
Increase productive capacity.
Improve the quality of work produced.
Do a job easier or in less time.
Reduce costs of operation.
Reduce or eliminate waste.
Eliminate bottlenecks, overlapping functions, duplication, spoilage.
More fully utilize present equipment or facilities.
Eliminate safety hazards.
Promote safety on the highways, and in the office, field, shop and laboratory.
Save space, material, supplies, tools and equipment.
Simplify forms and routine.
Strengthen public and employee relations.
Protect state property and equipment.
Combat time losses.
DO ANY JOB BETTER, QUICKER AND AT LESS COST.
[*Id.* at 2–3]

This list of objectives demonstrates a concern with the nuts and bolts of governmental operations.

The implementing regulations which were issued after the adoption of the State Employees' Awards Act in 1953 did not refer specifically to the subject matter of eligible suggestions. *Department of Civil Service, New Jersey State Employees' Award Program: Organization, Rules and Regulations* (1953). However, in its latest revision, effective August 4, 1978 (see 10 *N. J. R.* 371(b)), subpart 22–1.101c of the *Civil Service Personnel Manual* limits the scope of the pro-

gram to *"the improvement of the operations"* of the several departments of government. (Emphasis supplied).

Once the Legislature enacted the State Meat and Poultry Inspection Program, *N. J. S. A.* 24:16B–1 to 71, suggestions to improve the administration of that program could properly be considered by the Awards Committee. However, that would not embrace proposals that the Legislature reconsider its policy determination on whether to enact a law (as noted previously, the state act was adopted with the express purpose of complementing the federal law) or appropriate the necessary funds for implementation of that program. That issue was decided by a political balancing process entrusted to the Legislature and does not involve merely increased administrative efficiency.

What is true as to the Legislature is equally applicable to the Governor's exercise of a high level policy decision, such as the veto of a budget item. Here the Governor's veto of the $325,000 appropriation for the state meat and poultry inspection was such an exercise by the State's Chief Executive of his policymaking authority. The record overwhelmingly demonstrates that his action was induced by the fiscal crunch then existent. *Cf. In re Application of Lodge,* 155 *N. J. Super.* 488, 490 (App. Div.), certif. den. 76 *N. J.* 234 (1978) (finding nothing in record to show that employee's suggestion was responsible for adoption of executive order). Such an exercise of executive policymaking authority cannot form the basis of an award under the statute.

Reversed. No costs.

*For reversal*—Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—6.

*For affirmance*—None.